Filed 5/4/16  In re Andrew G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ANDREW G, a Person Coming Under the Juvenile Court Law. | D069015 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518815) |
| v. | |
| GRACIELA G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

When Andrew G. was a year old, the juvenile court declared him a dependent child and removed him from his parents' custody. This order was based on a history of domestic violence by the father (Father), and drug abuse by both Father and Andrew's mother, Graciela G.

Almost two years later, after the court had placed Andrew back in Graciela's custody, the court conducted a hearing under Welfare and Institutions Code[1] section 364. The San Diego County Health and Human Services Agency (Agency) recommended the court terminate jurisdiction.

At the hearing, the social worker testified that Graciela had failed to appear for recent drug tests, and had begun taking prescribed marijuana for "anxiety." Andrew's attorney opposed the Agency's request to terminate jurisdiction, noting Graciela's "litany" of missed drug tests and history of methamphetamine abuse. The court ordered that Andrew remain a dependent of the juvenile court.

Graciela appeals, asserting the order retaining jurisdiction is not supported by substantial evidence. Although in the juvenile court the Agency asked the court to terminate jurisdiction, now on appeal the Agency contends the order retaining jurisdiction should be affirmed. In her reply brief, Graciela asserts the Agency cannot "change sides" in this manner.

We affirm because the juvenile court's order retaining jurisdiction is supported by substantial evidence. Moreover, it is not inconsistent for the Agency, having advocated

---

[1] All statutory references are to the Welfare and Institutions Code.

in the juvenile court that jurisdiction should be terminated, to also recognize that the court's order retaining jurisdiction is supported by substantial evidence and therefore should be affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Dependency*

In October 2013 the Agency filed a petition on behalf of then one-year-old Andrew under section 300, subdivision (b).[2]  The petition alleged there was a substantial risk Andrew would suffer physical harm because his parents exposed him to violent confrontations involving physical force.  Specifically, Father "pushed, slapped, and punched" Graciela while she was holding Andrew, and on another occasion, pushed her and burned her back with a cigarette while Andrew was present.  Father also shoved Graciela while she was holding Andrew because she confronted him about using methamphetamine.  Graciela admitted that she had used marijuana and crystal methamphetamine before knowing she was pregnant with Andrew, and reported she had stopped using when she discovered she was pregnant and has not used drugs since.

---

[2]     Section 300, subdivision (b)(1) provides that a child is within the jurisdiction of the juvenile court where:  "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

3

At the subsequent detention hearing, the court found the Agency had made a prima facie showing that Andrew was a person described by section 300, subdivision (b) and there was no reasonable means to protect Andrew's physical or emotional health without removing him from the parents' physical custody. Graciela agreed to not have any contact with Father and to submit to drug testing. The court placed Andrew with a paternal relative.

In November 2013 the Agency prepared a jurisdiction/disposition report. The social worker interviewed Father, who admitted incidences of domestic violence between himself and Graciela. He denied using methamphetamines. Graciela, then 19-years old, told the social worker she started using crystal methamphetamine three years earlier, when she was 16 years old, and stopped in September 2011. Graciela began smoking marijuana at age 14 and stopped about one year ago. The social worker stated Graciela "appears to minimize her previous drug history."

The social worker concluded it was not safe to return Andrew to his parents' custody because they "continue to violate the criminal protective order by having contact with one another via texts." Moreover, the parents had not started any services to address "the substance abuse issues and domestic violence issues." The social worked noted Father failed to appear for his drug test; however, Graciela's drug test on October 11, 2013 was negative.

The social worker recommended the court offer Graciela and Father reunification services, and that Andrew remain in foster care with supervised parental visits. She also recommended that Graciela participate in a case plan that included general counseling, a

4

parenting education program, and substance abuse testing. The social worker recommended Graciela submit to drug tests twice each month, and "[st]ay free from illegal drugs and show [her] ability to live free from drug dependency. Comply with all required drug tests."

In December 2013 the juvenile court held a settlement conference before the disposition hearing. The parents submitted to the section 300, subdivision (b) count of the petition. The court removed Andrew from his parents' custody and placed him in a paternal relative's home. The court also ordered parental visitation and reunification services in accordance with the recommended case plans.

B. *Status Report—May 2014*

In the May 2014 status review report, the social worker reported that Andrew was doing well. Graciela attended nine therapy sessions, but missed two sessions without a plausible reason. The therapist stated Graciela was "motivated to be a protective parent." However, Graciela was a "no show" for two out of three drug tests, and was "not in compliance with this case plan activity." The social worker recommended that Andrew remain in out-of-home care with supervised parental visits, and that the court offer the parents additional services.

C. *Addendum Reports and Review Hearing—July and August 2014*

In a July 2014 addendum, the Agency noted Andrew was now living with his paternal grandparents and was adjusting well. During visits, Graciela's interaction was appropriate and the caregiver stated she had no concerns. Graciela was still failing to attend some of her therapy sessions without a plausible reason, and was not in

5

compliance with the domestic violence component of her case plan. Graciela submitted to drug tests, with results pending.

In an addendum prepared in August 2014, the social worker continued recommending that Andrew remain in out-of-home care with supervised parental visits. Graciela was not in compliance with the therapy portion of her care plan and still had not completed intake for a domestic violence group. Graciela submitted to two drug tests, but was a no-show for a third.

In August 2014 the juvenile court conducted a six-month review hearing (§ 366.21). The court found returning Andrew to his parents' custody would create a substantial risk of detriment to his physical and emotional well-being. The court continued Andrew's placement with the paternal grandparents, found his parents had not made substantial progress with their respective case plans, and ordered the Agency to provide them with additional services.

D. *Status Report and Hearing—December 2014 and January 2015*

In the December 2014 status report, the social worker stated Graciela attended therapy sessions and "has been willing to address her need for managing anger." Graciela was in compliance with her parenting and domestic violence case plan. Graciela took four drug tests, all negative. She was a no-show for a fifth test, asserting it conflicted with her work schedule.

The social worker reported that Father was not in compliance with his case plan. He had not attended any domestic violence group and was a no-show for all three drug tests. Father also did not enrolled in a parenting class as required.

The social worker recommended the court place Andrew with Graciela, terminate Father's services, and provide Father with supervised visits. She recommended Graciela comply with all required drug tests.

In January 2015 the court conducted a 12-month review hearing. After receiving the Agency's December 2014 report in evidence, the court found Graciela made substantive progress with her case plan and ordered the Agency to continue to provide her services. The court found Father had not made substantive progress with his case plan and terminated his services.[3] The court determined Andrew was still a dependent child of the juvenile court. The court placed Andrew with Graciela on the condition she "remain in compliance with her case plan."[4]

In returning custody to Graciela, the court cautioned her that she must remain in compliance with her case plan, stating:

> "The Court: The other thing that I just want to emphasize to [Graciela] is, we obviously want this to work. We want this to stick. Sometimes parents make the mistake that once the child is back in their care, they back away from services, they don't go through with a lot of the promises that they made to the social worker and the court, that is not going to work. That actually has the reverse effect.

---

[3]    In terminating services for Father, the court stated, "I do find that it is appropriate at this time to terminate reunification services to Father. He has not made substantive progress. He has not been in compliance with the criminal court orders relating to his . . . parole, and there's no substantial probability of return based upon the statutory factors. [¶] . . . He is circumventing other court orders." Father has not appeared in this appeal and has not contested termination of his services.

[4]    Andrew was living with his paternal grandparents. In February 2015, Graciela moved into that home, believing it to be in Andrew's best interests to remain there.

"Jurisdiction usually lasts longer in those circumstances, and sometimes the child is removed if you're not in compliance. So we want this to stick. And the services are really important now, so if there are stressors or things you need assistance with, especially with a two-year old, now is the time that you use all of the support that you have and stay engaged with the social worker and engaged in services."

E. *July-August 2015 Status Reviews*

In June 2015 Graciela reported two recent domestic violence incidents with Father. In early June 2015 Father arrived at the paternal grandparents' home while Graciela was getting ready for work. Her car was inoperable and she had asked her cousin for a ride. An argument ensued between Graciela and Father, and, when the cousin arrived, Father got into a physical altercation with the cousin. Graciela called the police; however, Father fled before the police arrived.

The second incident occurred the next weekend, when Father entered the home while Graciela was getting ready for work. He asked her to return his car. Graciela said she had bought it from his father, and the car was now hers. Father called Graciela a "hoe" and a "bitch," and Graciela was injured when she tried to run out of the house. Graciela locked herself in the bathroom and called the police. Father stole Graciela's purse and fled before the police arrived. Graciela stated Andrew was not home during either of these incidents.

The social worker recommended the court continue dependency jurisdiction for three additional months. She also recommended Andrew continue to be placed with Graciela, who was residing with Andrew with the paternal grandparents. The social worker noted Graciela completed 41 therapy sessions, missing only two. According to

8

the therapist, Graciela was very attentive to Andrew's needs and completed all her treatment goals. Graciela also completed an anger management course and her domestic violence group counseling.

However, Graciela was only in "partial compliance" with the drug testing component of her case plan: Graciela was a no-show for two drug tests, and the result of one other was pending.

In an addendum submitted a few weeks later, the social worker noted Graciela was a no-show in June 2015 for two out of three drug tests. The social worker recommended the court continue Andrew's dependency another three months. In a document entitled, "Safety Mapping," the social worker wrote Graciela was to "continue test neg[ative] not use drugs" and "refrain from drug use."

In mid-August 2015 the social worker prepared another report. She now recommended the court terminate jurisdiction and provide an exit order for Father's visitation. Andrew and Graciela continued to live with the paternal grandparents. By this time, Andrew had become very attached to the grandparents and Graciela relied on them for childcare while she was working. Graciela was provided information on low income housing and was continuing to look for her own housing.

The mid-August 2015 report stated Graciela was a no-show on two drug tests. Of the two drug tests she took, one was negative and one was pending. The social worker was unable to evaluate Graciela's compliance with drug testing. There had been no domestic violence incidents for about two months.

F.  *Review Hearing—September 2015*

In September 2015 the Agency prepared two reports.  The first, dated September 16, 2015, continued the August 2015 recommendation that the court terminate jurisdiction, even though Graciela was a no-show for four of five drug tests, making her noncompliant with her case plan.

Additionally, Graciela was now taking prescribed marijuana for anxiety, which was so severe in August 2015 an ambulance was called to provide her medical care.  Graciela assured the social worker she would not use marijuana in Andrew's presence, it would not be accessible to him, and if she uses marijuana, the grandparents would care for Andrew.  On September 22, 2015, the Agency submitted an addendum, which also recommended the court terminate jurisdiction pursuant to section 364, subdivision (c).[5]

The court conducted an evidentiary hearing.  Without objection, the court received five social worker reports in evidence.[6]  The social worker testified that Graciela was a no-show for several drug tests, and on September 16, 2015, tested positive for marijuana.  Nevertheless, the social worker recommended the court terminate jurisdiction because Graciela (1) had a medical marijuana prescription; and (2) agreed to comply with a safety plan providing Andrew would be under the grandparents' care when she was under the

---

[5]    Section 364, subdivision (c) provides in part:  "The court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn."

[6]    The court received into evidence reports dated July 1, 2015, July 30, 2015, August 19, 2015, September 17, 2015, and September 22, 2015.

influence of marijuana and she would not use marijuana in his presence. The social worker interviewed the grandmother, who stated she did not want marijuana in her home; however, she was willing to care for Andrew if Graciela was under the influence.

The social worker testified she had monthly contacts with Graciela and never observed her to be under the influence of a controlled substance or alcohol. Andrew's grandmother did not report concern about Graciela's use of any drugs. The social worker testified that Graciela was following the safety plan. She noted that Andrew's "basic needs are being met" and "there have been no concerns where the mother appears under the influence while caring for Andrew."

The social worker explained the Agency recommended the court terminate jurisdiction, despite Graciela's "multiple no shows" for drug tests because, "[E]very month that I have met with the mother, she never appears to be under the influence. She's never tested positive for meth throughout the course of the case that I have had it." The social worker also testified believed Graciela "has been abiding by the safety plans that we put in place" and the grandparent "has informed me that the mother appears to be abiding by this as well."

In response to the court's questions, the social worker stated that Graciela was prescribed marijuana for "anxiety," which she first experienced about six weeks before the hearing. Although the social worker admitted "it's always a concern" when a parent is a no-show, she did not immediately visit Graciela to determine if Graciela was under the influence when she failed to appear for her drug test.

11

The social worker admitted she did not discuss with Graciela alternatives to marijuana to address her anxiety, and Graciela did not tell her why she was anxious—nor did the social worker ever ask. Graciela told the social worker that when she uses marijuana, it is at the end of her school day, around four p.m, and she is not scheduled to care for Andrew until the grandparents return home with him around seven in the evening.

The social worker did not know if Graciela told the prescribing physician she is responsible for caring for a two-year old, or whether the physician knew she had a history of methamphetamine abuse. The social worker acknowledged "it is a concern" that Graciela may be inappropriately using drugs and dictating when she wants to drug test.

In closing argument, Andrew's attorney asked the court to not terminate jurisdiction, stating:

> "[W]e have a situation where the case came in for domestic violence. However, at jurisdiction, mother discussed history of using methamphetamine as well as marijuana. She indicated she used marijuana from age 14 to 18, and she indicated that she did not believe she had a problem—a drug problem with smoking marijuana.
>
> "At that time, substance abuse testing was added to her case plan and has remained on her case plan and is in the operative case plan for this reporting period.
>
> "Yet, . . . in that case plan, mother was required to test for the agency and to follow up with the substance abuse specialist's recommendations, if any.
>
> "In the last reporting period, mother failed to test on January 30, 2015, February 19, 2015, July 22, 2015, July 23, 2015, August 17, 2015, August 18, 2015, August 25, 2015, and August 28, 2015. We

12

do have a recent drug test that is positive for marijuana, as well as two negative tests.

"At this point in time, we have eight missed drug tests on a case plan that requires mother to substance abuse test for her case plan, with a parent who has a history of substance abuse.

"Mother's missed tests don't give us any guidance as to what mother was currently—is currently using and what her levels are. . . . There are eight missed drug tests we don't know whether mother was using or not using at that time. We don't have any information to give us any guidance as to whether mother was under the influence or not under the influence. [¶] . . .

"This is not a situation where my position is based solely on a medical marijuana card, it is a bigger concern of a methamphetamine history and multiple missed drug tests."

After the parties rested and completed closing arguments, the court ordered dependency jurisdiction to continue, stating:

"The Court: The Agency essentially says, today . . . despite this significant . . . and disturbing pattern of failing to show for drug tests, that . . . because mother's entered into a safety plan, and because she's presented a document indicating that she has a physician's statement and recommendation dated August 15, 2015, that she can use marijuana, that . . . [¶] . . . if supervision were discontinued, that there would be no conditions which would continue.

"And very respectfully, the court, having reviewed the evidence, I find that I cannot follow the Agency's recommendations today. And I say so for a significant number of reasons.

"First, mother continues to remain in a precarious situation. . . . [¶] [S]he is relying on Father's family, and they obviously have continued communication with him. [¶] But quite frankly, Father is a wild card. . . . He has unpredictable behavior. He doesn't follow the rules. He has not been in touch with the Agency. . . . [¶] But the situation is mother is in a circumstance where she is more at risk than in other circumstances because of the fact that she is living with

13

the paternal grandparents. . . . Father still remains untreated. Nothing has really changed since June. [¶] . . .

"And what is of very significant concern to the court is that the social worker did no investigation. . . . [¶] . . . And under these circumstances where mother is living in the home of the domestic violence perpetrator's parents, she obviously has some significant pressures on her, so much so that she is experiencing anxiety, none of that has been explored or investigated.

"And . . . while ordinarily I find the social worker to be very conscientious and thorough in her investigation, under these circumstances, I feel that this was grossly inadequately investigated. . . .

"The combination of the recent domestic violence incident in June . . . . The actor, the unpredictable person is still out there. And mother is clearly experiencing some kind of pressure . . . ."

On September 22, 2015, the court entered an order stating, "The court does not find [section] 364, [subdivision] (c) requirements have been met as fully stated on the record." The court found that "conditions still exist which justify initial assumption of jurisdiction under section 300, and/or conditions are likely to exist if supervision is withdrawn . . . ." The court ordered the Agency to investigate the issue of Graciela's anxiety and her choice of marijuana and the safety plan. The court placed Andrew with Graciela on the condition she follow all previous court orders including random drug testing.

On October 7, 2015, Graciela timely appealed from the order denying her request to terminate jurisdiction.

14

DISCUSSION

I. *THE ORDER REFUSING TO TERMINATE JURISDICTION IS SUPPORTED BY SUBSTANTIAL EVIDENCE*

A. *The Standard of Review*

"Orders made pursuant to section 364 are reviewed for substantial evidence." (*In re J.F.* (2014) 228 Cal.App.4th 202, 209.) Under the substantial evidence standard of review, the appellate court does not reweigh the evidence or evaluate the credibility of witnesses. We draw all reasonable inferences in support of the findings and view the record in the light most favorable to upholding the court's order. (*Ibid*.)

B. *Applicable Law*

"[S]ection 364 governs status review hearings for dependent juveniles who remain in the physical custody of their parents or guardians." (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1146 (*Aurora P.*), fn. omitted.) "[S]ection 364 also applies in cases such as this, where children have been removed from the physical custody of a parent but later returned." (*Id.* at p. 1155, fn. 9.)

"At the section 364 review hearing, 'the court is not concerned with reunification, but in determining "whether the dependency should be terminated or whether further supervision is necessary."'" (*Aurora P., supra,* 241 Cal.App.4th at p. 1155.) Section 364, subdivision (c) (section 364(c)) provides that the juvenile court "shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial

15

assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn."

"Thus, when the social services agency opposes termination of dependency jurisdiction, it clearly bears the burden of proof to show the existence of the conditions section 364(c) specifies must be proven to support retention of dependency jurisdiction." (*Aurora P., supra,* 241 Cal.App.4th at p. 1146.)

Here, however, the Agency took the opposite position and recommended dependency jurisdiction be terminated. It was counsel for Andrew, the dependent child, who opposed that recommendation. Because the dependent child opposed termination of dependency jurisdiction, he bore the burden of establishing by a preponderance of the evidence that "the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364(c); *Aurora P., supra,* 41 Cal.App.4th at p. 1147.) As explained in *Aurora P.*, "[w]hile the statute speaks in terms of the social worker or department establishing the basis for continuation of dependency jurisdiction, the first sentence of section 364(c) makes clear that the parent, the guardian, or the child may offer evidence on that question." (*Id.* at p. 1155.) The juvenile court is not bound by the recommendation of the social worker or social services agency, but makes an independent determination whether to terminate or retain jurisdiction based on the

16

preponderance of evidence. (*Ibid.*; accord, *In re J.F., supra,* 228 Cal.App.4th at pp. 211-212.)[7]

The second sentence of section 364(c) provides, "The court shall terminate its jurisdiction unless the social worker or his or her department establishes . . . that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." In *In re J.F., supra,* 228 Cal.App.4th at page 210, Division Five of the Second District concluded, "The language of section 364 does not literally require that the precise conditions for assuming jurisdiction under section 300 in the first place still exist—rather that conditions exist that '*would* justify initial assumption of jurisdiction.'" However, in *In re D.B.* (2015) 239 Cal.App.4th 1073, 1085, Division Three of the Fourth District disagreed, stating, "By using the phrase 'the conditions still exist,' the Legislature meant the conditions existing at the time of initial assumption of jurisdiction continued to exist at the time of the hearing, not that new conditions have arisen. Thus, we believe the better

---

[7] In its brief, the Agency states the juvenile court "erroneously placed the burden of proof on the Agency," but contends such error was harmless. However, the record does not establish the court misallocated the burden of proof. Initially, in orally stating its reasons for ruling, the court stated, "I do not find that the department has established by a preponderance of the evidence that conditions . . . which would justify initial assumption of jurisdiction under section 300, or that those conditions are likely to exist if supervision is withdrawn." However, later the court clarified its ruling, stating, "I do find by a preponderance of the evidence that conditions still exist which would justify the initial assumption of jurisdiction under section 300, and conditions are likely to exist if supervision is withdrawn." This statement is not inconsistent with Andrew bearing the burden of proof.

In any event, Graciela does not assert the order should be reversed because of any misallocation of the burden of proof. Rather, she contends Andrew bore the burden of proof and failed to meet it.

interpretation of section 364(c) is that the court must terminate jurisdiction if the conditions that justified taking jurisdiction in the first place no longer exist."

Here, we need not resolve this issue because, as explained *post*, the juvenile court's determination to not terminate jurisdiction is supported by substantial evidence on even the more restrictive standard, i.e., the conditions that justified initial assumption of jurisdiction—the threats of domestic violence and substance abuse—still continued to exist at the time of the section 364(c) hearing.

C. *Substantial Evidence Supports the Court's Order*

Substantial evidence supports the juvenile court's determination to not terminate jurisdiction. Although the instigating cause of Andrew's dependency was domestic violence, drug abuse by both Father and Graciela permeated these proceedings from day one.

For example, the declaration in support of the protective custody warrant for Andrew issued in October 2013 states, "[T]he Agency is recommending that the case be brought to the attention of Juvenile Court and Andrew be detained in out of home care in order for the parents to understand the consequences of exposing the child to a controlled substance and risk of harm they pose to the child based on their history of domestic violence."

Moreover, during the Agency's initial investigation, Graciela admitted a history of marijuana and methamphetamine use and stated she was willing to drug test. She began smoking marijuana at age 14 and continued, by her own report, through age 18 (she was 19 years old when dependency proceedings began). Graciela began smoking

18

methamphetamine at age 16 and claims to have stopped in September 2011. Given her substance abuse history, from inception Graciela's case plan included substance abuse programs and frequent drug tests.

Graciela made substantial progress in some components of her case plan. However, she was frequently not in compliance with the drug testing component of her case plan and court orders. For example, during the first review in May 2014, Graciela did not show for two out of three drug tests. In August 2014 Graciela again failed to drug test. She missed another drug test in December 2014. Despite promising to comply with all required drug tests, in the June 2015 reporting period, Graciela was a no show in two of four drug tests. In July 2015 she again failed to appear for two drug tests. The August 2015 report states Graciela was a no show for two out of four drug tests. The social worker concluded the substance abuse part of her case plan "cannot be evaluated." The September 2015 report—submitted about a week before the court's ruling that Graciela appeals here—states she was a no show for four drug tests.

On this evidence alone, the juvenile court properly concluded under section 364(c) that "the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn."

Moreover, there is also substantial evidence that the threat of domestic violence by Father—a condition that existed when the court first declared Andrew a dependent—still existed at the time of the section 364(c) hearing. In June 2015, when Graciela was living in the paternal grandparents' home with Andrew, Father committed two separate acts of

domestic violence. One ended in a physical fight between Father and Graciela's cousin. In the other, Graciela was injured trying to escape from Father.

Thus, from inception of the case through the time of the section 364(c) hearing, Father remained a domestic violence threat. Moreover, he knew where Graciela and Andrew were living and knew when they would be home. The juvenile court properly exercised its discretion based on substantial evidence in concluding, "mother continues to remain in a precarious situation . . . she is relying on Father's family, and they obviously have continued communications."

Graciela's contention that the court's order is unsupported by substantial evidence is not persuasive. She contends Andrew was removed from custody only because of domestic violence issues, stating, "Domestic violence was the condition that existed and the reason for the initial assumption of section 300 jurisdiction." She asserts the order should be reversed because there was no domestic violence threat at the time of the section 364(c) hearing.

Graciela is incorrect on both issues. Domestic violence was not the only reason for the exercise of dependency jurisdiction. In declaring Andrew a dependent child of the juvenile court, the court stated it considered the Agency's reports dated October 23, 2013 and November 12, 2013. The October 23, 2013 report states Graciela admitted using marijuana and crystal methamphetamine, and stated she would drug test. The November 12, 2013 report states Graciela began using crystal methamphetamine at age 16 and smoked marijuana. Under the section entitled, "Child's Safety in the Home," the social worker stated it is not safe for Andrew to return home with his parents because of

"substance abuse issues and domestic violence issues." Of extraordinary concern, the report states that Graciela "appears to minimize her previous drug history."

Moreover, substantial evidence supports the juvenile court's finding that the threat of domestic violence was not resolved. Four months before the section 364(c) hearing, Father confronted Graciela at the home she and Andrew were living in, got in a fist-fight with Graciela's cousin, chased Graciela into a bathroom where she had to barricade herself for safety, and stole her purse and its contents. Father remained at large and refused to comply with any components of his case plan. In January 2015 the court found Father was "circumventing" court orders. At the time of the section 364(c) hearing, Graciela was living in the home of the domestic violence perpetrator's parents. As the court aptly noted, "The actor, the unpredictable person is still out there. . . . [¶] . . . [¶] And as long as mother remains in the circumstance where she lives at a residence known to the domestic violence perpetrator, where he has a strong relationship and is in communication with other persons in the home, this is a higher risk situation than others."

Graciela also contends the court based its decision on a "new development"— Graciela's recent use of prescribed marijuana to treat anxiety. Graciela contends these facts are insufficient to establish dependency jurisdiction under section 300, subdivision (b), and thus cannot be used to retain jurisdiction under section 364(c).

Graciela's argument is not persuasive because it takes too narrow a view of the evidence. The juvenile court properly considered the totality of circumstances in determining whether to terminate jurisdiction under section 364(c). (*Aurora P., supra,*

241 Cal.App.4th at p. 1155 [the juvenile court makes its determination under section 364(c) "'based on the totality of the evidence before it'"].) The totality of the evidence presented at the hearing established Father was a continuing threat of domestic violence. Moreover, Graciela was willfully defying court-ordered drug testing, despite her history of marijuana and methamphetamine abuse.

In light of these preexisting conditions, the court properly considered and expressed concern about Graciela's recent use of marijuana to treat her self-diagnosed anxiety. Graciela's anxiety and marijuana use exacerbated the domestic violence and drug abuse conditions that required the exercise of dependency jurisdiction in the first place.

In her reply brief, Graciela also asserts Andrew did not sustain his burden of proof because his attorney asked only one question and "did not present any evidence." However, we review the "entire record" for substantial evidence, regardless of which party offered any particular evidence. (See *In re Megan S.* (2002) 104 Cal.App.4th 247, 251 ["If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings."].) Moreover, the juvenile court is required to make its determination "'based on the totality of the evidence before it.'" (*Aurora P., supra,* 241 Cal.App.4th at p. 1155.) In determining whether to terminate jurisdiction under section 364(c), the court properly considered all of the evidence, regardless of which party offered it.

D.  *The Agency Did Not Forfeit Its Appellate Argument*

In her reply brief, Graciela contends the Agency "forfeited" its appellate arguments because in the juvenile court, the Agency advocated the court should terminate jurisdiction.  This argument is unavailing for at least two reasons.  First, it is not necessarily inconsistent to advocate one factual position in the trial court, and then on appeal concede that the court's adverse determination is supported by substantial evidence.  This is because the substantial evidence standard of review indulges in every reasonable inference to uphold the judgment and defers to the trier of fact's credibility determinations.  (See *Cardinal Health 301, Inc. v. Tyco Electronics Corp.* (2008) 169 Cal.App.4th 116, 146.)

Perhaps more importantly, the goals of the California dependency system are to ensure the child's safety, protection, and physical and emotional well-being, and when possible, to preserve and strengthen the family.  (Cal. Juvenile Dependency Practice (Cont.Ed.Bar 2016) How Children Enter the Dependency System, § 2.1, p. 38.)  The Legislature has determined, "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical well-being of the child."  (§ 300.2.)

In light of these policies, if the Agency did change its fundamental view of this case after the hearing, that change should be commended, not condemned.  The Agency's reputation for credibility and justice will foster its success in court in the long run better than will a blind allegiance to an inappropriate approach to a particular case taken in the juvenile court.

23

DISPOSITION

The order is affirmed.

NARES, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.