Filed 5/28/24  In re Abigail M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ABIGAIL M., a Person Coming Under the Juvenile Court Law. | B329969 (Los Angeles County Super. Ct. No. 22CCJP03179) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSE M., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

Jose M. (father) appeals from an order terminating jurisdiction over his daughter Abigail M. (born October 2015) pursuant to Welfare and Institutions Code section 364[1] with a custody order granting sole legal and physical custody to mother Rosa A. (mother) with monitored visits for father. Father contends the juvenile court erred in terminating jurisdiction because continued jurisdiction is necessary to enforce his conjoint counseling and visitation with Abigail. We affirm the order of the court.

**FACTUAL AND PROCEDURAL HISTORY**

**The family**

When these proceedings commenced, Abigail lived with mother, her half siblings Darlene P. (born July 2008) and Matthew S. (born November 2020), and Matthew's father, Christopher S.[2] Father had no contact with Abigail for five years prior to the commencement of these proceedings.

**Prior referral involving father**

On November 5, 2017, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging a violent altercation among father, mother and Christopher S. Father was returning Abigail to mother's home at 7:00 a.m. after the weekend visit. Mother arrived at 7:30 a.m. with her boyfriend Christopher S. Father left Abigail in the car, shoved Christopher S. in the chest, began an argument, and

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Darlene P. and Matthew S. are not subjects of this appeal. Christopher S. and Darlene's father, Luis P., are not parties to this appeal.

threatened to kill Christopher S.  Father also argued with mother, who he grabbed by the neck and began to choke.  A neighbor witnessed the incident and called police.  Father took Christopher S.'s cell phone and left in his car.  He was stopped by police and arrested for domestic violence, making a criminal threat, theft of Christopher S.'s phone and driving with a suspended license.  Mother obtained a temporary restraining order.

**Current referral and investigation**

On June 24, 2022, DCFS received a referral alleging Christopher S. pulled a knife and threatened to kill himself on the preceding day, with mother's encouragement.  An aunt was present and intervened.  The same day, mother and Christopher S. were heard arguing, and Christopher S. was heard telling mother to stop hitting him.  The aunt observed Christopher S. holding mother down next to Matthew's crib.  Matthew had a fever of 102 degrees.  It was believed the parents were caught up in their argument and neglecting the needs of the child.

Mother confirmed the allegations were true.  Mother and Christopher S. also admitted disciplining Abigail by hitting her with a belt on one occasion.  Christopher S. indicated, though he had only used the belt on Abigail once, he would refrain from such behavior in the future.

Abigail, six years old and entering first grade, reported her basic needs were met at home and denied anyone was mean to her.  Abigail did confirm Christopher S. hits her with a belt on her bottom when she misbehaves and reported having been left with a bruise on her leg.  Abigail considered Christopher S. her father and calls him "Daddy."  Abigail confirmed mother and

Christopher S. fight and hit each other. Mother and Abigail had not had contact with father for five years as, he was not part of Abigail's life.

The family agreed to a voluntary safety plan. The children remained with mother at the home of maternal grandmother.

On August 10, 2022, DCFS was unable to contact father at his last known number, but the social worker left a detailed message.

**Petition and initial hearing**

On August 15, 2022, DCFS filed a section 300 petition on behalf of Abigail and her half siblings alleging mother and Christopher S. engaged in domestic violence, that Christopher S. had mental and emotional problems, including suicidal ideation and self-harming behavior, and that Christopher S. physically abused Abigail by striking her with a belt, causing bruising. Father was not named in the petition.[3]

Father was present at the August 29, 2022 initial hearing. The juvenile court found he was Abigail's presumed father. The court released Abigail and her half siblings to the home of mother under the supervision of DCFS. The court noted father was not named in the section 300 petition and ordered DCFS to assist in setting up conjoint counseling for father with Abigail. Father was granted monitored visitation, with DCFS given discretion to liberalize.

**Jurisdiction and disposition**

The jurisdiction hearing took place on October 12, 2022. Father appeared by phone with counsel, who informed the court

_____

[3] On September 29, 2022, a first amended petition was filed adding a count regarding Luis P., but not father.

4

father was having trouble reaching the social worker. Counsel requested the social worker contact father by the end of the week to arrange visitation. Father had not yet had a visit with Abigail.

On November 1, 2022, father again appeared with counsel, who raised the issue of visitation, explaining father had not had a visit with Abigail despite his efforts to contact the social worker. In addition, DCFS was supposed to evaluate father's home and had not yet done so.

The court declared Abigail a dependent of the court and released her to the home of mother. Father was ordered to participate in conjoint counseling with Abigail when deemed appropriate by the child's therapist. Father was granted monitored visits, with discretion to liberalize, twice a week for two hours. The court set a hearing date of November 30, 2022, to address father's visitation with Abigail, a progress hearing for January 31, 2023, and a review hearing for May 2, 2023.

**Progress reports and hearings**

On October 12, 2022, November 4, 2022, and November 16, 2022, the social worker telephoned father and left detailed messages, including her contact information. Father had still not been in contact with DCFS.

On November 15, 2022, the social worker spoke with Abigail, who had no memory of father and did not want to visit with him. The social worker informed Abigail she would not be forced to visit, but they would address the issue again.

At the November 30, 2022 hearing, father denied anyone from DCFS had telephoned him, yet acknowledged the telephone number in the report was his. Father had no visits, and conjoint counseling had not begun. The court noted Abigail did not want visits, and suggested starting with monitored virtual visits. The

court ordered Abigail's therapist to assist with her resistance to visits and incorporate father into the therapy. County counsel reiterated father had not been in touch with DCFS.

At the progress hearing on January 31, 2023, father appeared by telephone with counsel, who indicated father had been unsuccessfully trying to have visits with Abigail and requested that DCFS contact him. The children's attorney noted Abigail's therapist was supposed to be dealing with the issue, and it was not as simple as merely setting up visits.

In a status review report filed on April 28, 2023, DCFS noted mother and Christopher S. had fully complied with their court-ordered treatment programs. The three children were living with mother and Christopher S. Mother and Christopher S. had regular contact with DCFS and continued to protect the children from further exposure to family violence. Christopher S. took full responsibility for his actions and expressed gratitude to DCFS for helping him get his life together. In an interview on April 21, 2023, Abigail stated, "I love my family and I am happy. Daddy Christopher is good to me."

DCFS assessed the family's risk level as low and recommended termination of juvenile court jurisdiction.

On May 30, 2023, DCFS filed a last minute information for the court indicating the social worker had met with father at the DCFS office. Father reported he lived with his sister and niece in Pasadena and worked Monday through Friday from 5:00 p.m. to 1:30 a.m. Father had no contact with Abigail for five years because mother relocated, stopped all communication with him, and hid Abigail from him. Mother's family refused to tell him anything. Father admitted engaging in the physical altercation in 2017 when he saw mother with Christopher S. Mother had

6

then obtained a three-year restraining order that prevented contact between father and mother and Abigail. Father did not want to wait any longer to have contact with Abigail. He indicated he would ask his sister to monitor visits. The social worker informed father that Abigail did not want visits. Father understood and would continue to be available for visits. On May 11, 2023, the social worker submitted a mental health referral for conjoint counseling.

On May 19, 2023, DCFS interviewed mother, who stated father's last contact with Abigail had been in 2017, and he had never been in the child's life. Mother denied keeping Abigail from father and said he had opportunities to get in touch with Abigail and be part of her life.

Abigail told the social worker she did not remember anything about father. Abigail did not want to visit with father because she did not know him.

DCFS informed the court father "has not been available to [DCFS] to work toward having visitations with the child Abigail and participate in conjoint counseling." DCFS recommended termination of jurisdiction over Abigail with sole legal and physical custody to mother and monitored visits for father.

**Termination of jurisdiction**

On May 31, 2023, the juvenile court held a review hearing that father attended by Webex with counsel. The court ordered sole legal and physical custody to mother, with father to have visits once a month at a minimum. Father's counsel did not object to the court's order. The court did not need a custody order for Matthew and terminated jurisdiction on that date. As to Abigail and Darlene, the court continued the matter for submission of a custody order.

7

On June 7, 2023, the juvenile court filed the custody order regarding Abigail that specified, "Father has monitored visits a minimum of 2 hrs per visit once per month. Visits to be monitored by a mutually agreed upon monitor or professional monitor paid for by Father." The order indicated father had not completed, nor made substantial progress in, conjoint counseling with Abigail.

**Notice of appeal**

On June 13, 2023, father filed a notice of appeal from the orders made on May 31, 2023, at the section 364 hearing.

## DISCUSSION

### I. Mootness

DCFS argues father's appeal of the May 31, 2023 orders was rendered moot by the subsequent issuance of the custody order on June 7, 2023. DCFS points out that father's notice of appeal identified only the findings made on May 31, 2023, and father failed to appeal from the issuance of the custody order on June 7, 2023, which superseded the court's previous order. Thus, reversal of the orders made on May 31, 2023, would not provide father any effective relief. DCFS argues father's appeal is therefore moot. (Citing *In re E.T.* (2013) 217 Cal.App.4th 426, 436 ["An appeal may become moot where subsequent events, including orders by the juvenile court, render it impossible for the reviewing court to grant effective relief."]; *In re Dani R.* (2001) 89 Cal.App.4th 402, 404 [granting of mother's § 388 petition and stipulation of parents to findings of the juvenile court rendered appeal moot].)

"A judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any

8

subsequent order may be appealed as an order after judgment." (§ 395, subd. (a)(1); accord, *In re S.B.* (2009) 46 Cal.4th 529, 531-532.) "The dispositional order is the 'judgment' referred to in section 395, and all subsequent orders are appealable." (*In re S.B.*, at p. 532.) "'"A consequence of section 395 is that an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order."'" (*Ibid.*)

However, "[g]enerally, we must liberally construe a notice of appeal in favor of its sufficiency. (Cal. Rules of Court, rules 8.100(a)(2), 8.405(a)(3).) A notice of appeal shall be '"liberally construed so as to protect the right of appeal if it is *reasonably clear* what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced."'" (*In re J.F.* (2019) 39 Cal.App.5th 70, 75.)

There are limits to a court's ability to liberally construe a notice of appeal. (*In re J.F., supra*, 39 Cal.App.5th at p. 76.) "'The policy of liberally construing a notice of appeal in favor of its sufficiency [citation] does not apply if the notice is so specific it cannot be read as reaching a judgment or order not mentioned at all.'" (*Ibid.*) "'[I]t is well "beyond liberal construction" to view an appeal from one order as an appeal from a "further and different order."'" (*Ibid.*)

Here, we find we may liberally construe father's notice of appeal to include the later-issued order of June 7, 2023. On May 31, 2023, the juvenile court made the findings and orders on the record and stayed termination of jurisdiction until June 7, 2023, to allow mother's counsel to prepare and submit the juvenile custody order. Father's notice of appeal, which was filed just six days after the filing of the juvenile custody order, may

9

reasonably be construed to encompass the June 7, 2023 order. The June 7, 2023 order was not a different order, but the same order, reduced to writing. Further, DCFS could not have been misled or prejudiced by father's failure to specify the later order. The June 7, 2023 order did not differ substantively from the order made verbally on May 31, 2023.

Under the circumstances, we elect to liberally construe father's notice of appeal to include the June 7, 2023 order and address father's arguments on the merits.

## II. Applicable law and standard of review

Section 364 applies when "a child under the supervision of the juvenile court . . . is not removed from the physical custody of his or her parent or guardian." (§ 364, subd. (a).) Because Abigail remained with mother throughout these proceedings, section 364 is applicable here.

Section 364, subdivision (c) provides: "After hearing any evidence presented by the social worker, the parent, the guardian, or the child, the court shall determine whether continued supervision is necessary. The court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn. Failure of the parent or guardian to participate regularly in any court ordered treatment program shall constitute prima facie evidence that the conditions which justified initial assumption of jurisdiction still exist and that continued supervision is necessary."

Section 364 thus provides a statutory presumption in favor of termination of jurisdiction unless a party proves, by a

10

preponderance of evidence, the conditions still exist that justified the initial assumption of jurisdiction. (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1155 (*Aurora P.*).) Under the statute, "the juvenile court must terminate dependency jurisdiction unless either the parent, the guardian, the child, or the social services agency establishes by a preponderance of the evidence that the conditions justifying assumption of jurisdiction exist or will exist if supervision is withdrawn." (*Id.* at pp. 1155-1156.) In short, under section 364, "termination of dependency jurisdiction will be the 'default result.'" (*Aurora P.*, at p. 1156.) The juvenile court makes its determination as to whether or not to continue jurisdiction "'based on the totality of the evidence before it.'" (*Id.* at p. 1155.)

Orders terminating jurisdiction pursuant to section 364 are reviewed for substantial evidence. (*Aurora P., supra*, 241 Cal.App.4th at p. 1156.) The party challenging the juvenile court's decision to terminate jurisdiction has the burden of proving that conditions justifying assumption of jurisdiction continued to exist or would exist if supervision were withdrawn. (*Id.* at pp. 1155-1156.)

## III.   **Father has failed to meet his burden of proof**

Father has the burden of proving that the evidence before the juvenile court compelled a finding that continued supervision was necessary because conditions justifying assumption of jurisdiction continued to exist or would exist if supervision were withdrawn. (*Aurora P., supra*, 241 Cal.App.4th at pp. 1157, 1163.) Father has failed to meet this burden.

Abigail came under the jurisdiction of the juvenile court due to domestic violence between mother and Christopher S., Christopher S.'s mental and emotional problems, and

11

Christopher S.'s physical abuse of Abigail. Father had no relationship of any kind with Abigail at the time these proceedings commenced.

At the section 364 hearing, the juvenile court had evidence showing mother and Christopher S. substantially complied with their court-ordered case plans and there were no longer any safety issues requiring juvenile court supervision. Abigail had remained with mother throughout the proceedings and expressed to the social worker that she felt happy and safe in the home. Father provided no evidence at the section 364 hearing suggesting the conditions justifying court supervision remained or that such conditions would exist if supervision were withdrawn. Under the circumstances, termination of jurisdiction was mandatory. (§ 364).

Father argues that termination of jurisdiction was error because the juvenile court did not require DCFS to carry out the initial orders regarding conjoint counseling between father and Abigail. However, Abigail's relationship with father was not one of the conditions that brought Abigail within the jurisdiction of the juvenile court. At the time the juvenile court exercised jurisdiction, father had not seen Abigail in five years. Nothing in section 364 permits the juvenile court to retain jurisdiction to assist in counseling with a nonoffending parent. Because the conditions no longer existed that justified the initial assumption of jurisdiction, the court was required to terminate its jurisdiction over Abigail.

Father has the benefit of the custody order to enforce his rights to visitation with Abigail in family court. Father contends it will be difficult for him to make substantial progress in conjoint counseling without the cooperation of DCFS or mother in this

12

case.  Again, father points to no legal authority suggesting a juvenile court may retain jurisdiction over a child in order to assist a parent in furthering his relationship with a child he admittedly has not seen in over five years.

Father points out pursuant to section 202, subdivision (a), the purpose of the juvenile court law is to "preserve and strengthen the minor's family ties whenever possible."  Father argues completion of conjoint counseling with Abigail could have constituted a significant change of circumstances for the purpose of modifying the juvenile court's final custody order.  However, due to father's absence from so much of Abigail's young life, the family unit the juvenile court was concerned with consisted of the children, mother, and Christopher S.  The evidence showed Abigail did not remember father and thought of Christopher S. as her father.  The juvenile court was not required to become involved with reuniting absent parents who were not part of the child's life at the time the proceedings commenced.

Father objects that the juvenile court removed Abigail from father during the proceedings, although he was nonoffending.  Father did not appeal the November 1, 2022 order removing Abigail from his custody. "'"[A]n unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order."'" (*In re S.B., supra,* 46 Cal.4th at p. 532.)  Father did not list the removal order in his notice of appeal, and it is not before us in this appeal.  Father may raise custody issues in the family law court.

Father failed to satisfy his burden of showing conditions existed that would justify initial assumption of jurisdiction under section 300 or that those conditions were likely to exist if supervision were withdrawn.  (§ 364, subd. (c); *Aurora P., supra,*

13

241 Cal.App.4th at pp. 1155-1156.) The juvenile court properly terminated jurisdiction over Abigail.

## DISPOSITION

The order is affirmed.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
HOFFSTADT, J.